Edward SMITH, Irene Smith, John Porte, and Mae Hunt, Plaintiffs-Appellants,

v.

CITY OF SOUTH BEND; Jerry E. Miller, Mayor of the City of South Bend, Indiana; Jack R. Bland, Chief of the Fire Force of the City of South Bend, Indiana; John H. Walsh, Chief of the Police Department of the City of South Bend, Indiana; Board of Trustees of the Firemen's Pension Fund of the City of South Bend, Indiana; Board of Trustees of the Police Pension Fund of the City of South Bend, Indiana, Defendants-Appellees.

No. 3–677A151.

Court of Appeals of Indiana, Third District.

Feb. 4, 1980.

Rehearing Denied Feb. 29, 1980.

Roland Obenchain, Milton A. Johnson, South Bend, for plaintiffs-appellants.

Timothy P. McLaughlin, Thomas J. Brunner, Jr., South Bend, for defendants-appellees.

HOFFMAN, Judge.

This is an action for declaratory judgment brought against the City of South

Bend et al. (City) by retired policemen and firemen and the widows of former policemen and firemen of the City (collectively referred to as Retirees) to recover additional pension benefits for the years 1970 to 1975, inclusive. Police retirees were seeking the difference between the pension benefits already paid and those payable if the pension base had been calculated according to the monthly wage paid to a corporal. Fire retirees sought a similar recomputation based on the monthly salary of an engineer.

In general the trial court found that police pensions had been properly computed on the basis of the salary paid to a first-class patrolman and fire pensions had been properly computed on the basis of the salary paid to a first-class fireman. The court also found that during the years in question corporals on the force were not first-class patrolmen nor were engineers on the fire department first-class firemen. It further found that corporals and engineers were paid by rank and not by length of service. Accordingly, judgment was entered in favor of the City.

The issues raised by this appeal are:
(1) whether the findings of fact and conclusions of law are clearly erroneous;
(2) whether the trial court erred in rejecting the Retirees' offer to read into evidence statements made by the City in response to certain motions to produce; and
(3) whether the trial court improperly rejected the Retirees' offer of Exhibit 4 into evidence.

Retirees assail the findings of fact and conclusions of law as being clearly erroneous. They insist that the only difference between a corporal and a first-class patrolman and an engineer and a first-class fireman is that the corporals and engineers receive additional pay based on length of service. It is suggested that the titles of corporal and engineer were created so that the City would not have to include longevity pay in the computation of pension benefits.

■ The findings or judgment of the trial court will be found clearly erroneous only when on the entire record the reviewing court is left with the definite and firm conviction that a mistake has been committed. *University Casework Systems, Inc. v. Bahre* (1977), Ind.App., 362 N.E.2d 155.

The record discloses that on July 28, 1969 the Board of Public Works and Safety (Board) adopted a resolution establishing a salary schedule for the City's police and fire departments which included corporals and engineers. During the years in question the South Bend Police Department rank structure included in decreasing order of salary: (1) chief; (2) division chief; (3) captain; (4) lieutenant; (5) sergeant; (6) corporal; (7) first-class patrolman; (8) patrolman; and (9) officer-in-training. Throughout these same years the rank structure of the South Bend Fire Department included in decreasing order of salary: (1) chief; (2) assistant chief; (3) battalion chief; (4) captain; (5) lieutenant; (6) engineer; (7) fireman first-class; (8) fireman; and (9) fireman-in-training. In both departments, each member of a particular rank received the same salary as all other members of that rank. From the budget requests and pay ordinances it is apparent that as an individual advanced in rank his salary increased. Furthermore, there were varying numbers of policemen who were first-class patrolmen and policemen who were corporals. Similarly, there were varying numbers of firemen who were first-class firemen and firemen who were engineers. A comparison of statistics compiled by the City shows the following:

| Firemen First Class | | Engineers |
|---|---|---|
| 1969 | 131 | 0 |
| 1970 | 7 | 153 |
| 1971 | 32 | 142 |
| 1972 | 28 | 133 |
| 1973 | 35 | 143 |
| 1974 | 30 | 134 |
| 1975 | 23 | 165 |

| Patrolmen | | Corporals |
|---|---|---|
| 1968 | 68 | 0 |
| 1969 | 46 | 0 |
| 1970 | 20 | 66 |
| 1971 | 33 | 60 |
| 1972 | 41 | 57 |
| 1973 | 41 | 64 |
| 1974 | 51 | 72 |
| 1975 | 29 | 74 |

It was also established that promotions were not automatic. After five years of service first-class patrolmen and firemen became eligible for promotion to the respective ranks of corporal and engineer. The first step in attaining such a promotion was to obtain a recommendation from the police or fire chief. However, if the chief determined that an individual's general performance did not warrant a promotion, it was within his power to withhold any recommendation. In fact four or five first-class patrolmen were not recommended for promotion to the rank of corporal. If a recommendation was obtained then the Board could approve the promotion by resolution and order. Nevertheless the Board was authorized to reject any recommendation from the chiefs.

■ In light of this evidence, it must be concluded that the findings of fact were not clearly erroneous. The record reveals that salaries were paid by rank and not by length of service. No first-class patrolman or fireman was automatically entitled to a promotion after five years of service. The fact that very few patrolmen or firemen were denied promotions may indicate that the City considered their respective forces to be of a high caliber. It certainly does not lead irresistibly to the conclusion that the City's purpose in creating the ranks of corporal and engineer was to circumvent the pension laws.

IC 1971, 19–1–24–3 (Burns Code Ed.) provides generally that police pensions shall be computed on the basis of the monthly salary of a first-class patrolman. IC 1971, 19–1–37–14 (Burns Code Ed.) provides that fire pensions are to be based on the monthly pay of a first-class fireman. The City acted in accordance with these statutes. To the extent that Retirees believe their pensions ought to be computed on the basis of the salary paid to corporals or engineers, their recourse lies with the Legislature. Here Retirees failed to sustain their burden of proof that corporals and engineers were the same as first-class patrolmen and firemen.

■ Retirees also contend that the findings were erroneous because: (1) ulti-

mate facts and not evidentiary facts should be set out in the findings of fact; (2) the findings contained conclusions of law; and (3) facts missing in the findings cannot be supplied by the conclusions of law. This contention was disposed of by *In re Marriage of Miles* (1977), Ind.App., 362 N.E.2d 171 where the court opined:

"It is the stated purpose of our trial rules to secure the just, speedy and inexpensive determination of every action. To that end TR 52 must be construed as abolishing the old highly technical distinctions and treacherous consequences which attended the consideration of whether a 'finding' was an evidentiary fact, an ultimate fact, a conclusion of fact or a conclusion of law." (Footnote omitted.) 362 N.E.2d at 174.

Special findings are intended to preserve the grounds for error on appeal by disclosing the factual basis for the legal theory applied below. *Indianapolis Raceway Park, Inc. v. Curtiss* (1979), Ind.App., 386 N.E.2d 724.

"Thus, whether the findings are adequate depends upon whether they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment. In making this determination a reviewing court will accept the findings made by the trial court if they are supported by evidence of probative value. *Miller v. Ortman, supra,* [(1956), 235 Ind. 641, 136 N.E.2d 17]; *First Nat'l. Bank of Mishawaka v. Kamm* (1972), 152 Ind.App. 353, 283 N.E.2d 563. Furthermore, on appeal the findings will be construed together and will be liberally construed in support of the judgment. *Scott v. Kell* (1956), 127 Ind.App. 472, 134 N.E.2d 828, *trf. den.* 141 N.E.2d 106; TR 52(A)." *Miles, supra,* 362 N.E.2d at 174.

As noted earlier, the findings of fact and judgment of the trial court were not clearly erroneous. The findings disclosed that the theory on which the trial court decided the case was that first-class patrolmen and firemen were not corporals and engineers and that salaries were paid by rank rather than length of service. There was no error here.

Retirees next maintain the trial court erred in rejecting their offer to read into evidence statements made by the City in response to certain motions to produce. Prior to trial Retirees filed two motions to produce. The first motion sought the production of written job descriptions adopted for the categories of first-class patrolmen and corporals for the years 1969 through 1975. In their response the City stated that they had no written job descriptions for the categories in question. The second motion sought the production of all documentary evidence setting out the qualifications for the ranks of corporal and engineer other than length of service. The City's response to this motion stated that there was no documentary evidence which established other qualifications for the ranks of corporal or engineer besides length of service.

■ Retirees first allege that these responses were admissions in a pleading. This allegation is ill-founded. Ind.Rules of Procedure, Trial Rule 7(A) provides in part:

"The pleadings shall consist of:

(1) a complaint and an answer;

(2) a reply to a denominated counterclaim;

(3) an answer to a cross-claim;

(4) a third-party complaint, if a person not an original party is summoned under the provisions of Rule 14; and

(5) a third-party answer.

No other pleadings shall be allowed;" Thus a party's responses to motions are not pleadings and cannot be considered as admissions in a pleading. *See, Pomerenke v. Nat. Life and Acc. Ins. Co.* (1968), 143 Ind. App. 472, 241 N.E.2d 390 where it was held that a motion for summary judgment is not a pleading.

■ Retirees also assert that the responses should have been introduced as admissions. An admission is a statement against the interests of a party which is inconsistent with the defense or tends to establish or disprove a material fact. *Marsh v. Lesh* (1975), 164 Ind.App. 67, 326 N.E.2d 626. Under the particular circumstances existing in the case at bar, these responses do not

qualify as admissions since their only import was to inform the Retirees that the City could not comply with the discovery request. These responses were required by Ind.Rules of Procedure, Trial Rule 34(B) which provides that a party upon whom a request to produce is served shall serve a written response to the request. *Cf.: Dure v. City of Macon* (1925), 159 Ga. 875, 127 S.E. 142 where the failure of the city to produce documents of title to certain land in response to a notice to produce was held not to amount to an admission that the city did not have title nor did it relieve the petitioners of the burden of showing that the city did not have title.

■ Ind.Rules of Procedure, Trial Rule 34 is a vehicle for inspecting and copying documents and other tangible things. It serves as a device to ascertain items that might be admissible evidence for a party or lead to admissible evidence or otherwise assist in the preparation of the trial. However, it was not intended that the motions and replies themselves would be evidence particularly in the factual context here.

Of course the very nonexistence of certain documents may be of some evidentiary value. Nevertheless, the disallowance of the City's responses into evidence should not have presented any great obstacle to the Retirees since the discovery rules provided several other avenues to establish that there were no written job classifications for the ranks of corporal and engineer or qualifications for those ranks aside from length of service. For example, the Retirees could have made a request for admissions, could have filed interrogatories or could have taken depositions. Finally they could have called witnesses at the trial to substantiate these contentions. The trial court was correct in its ruling.

Also assigned as error is the trial court's refusal to admit into evidence Exhibit 4, the job classification manual of the Fire Department. Before trial the City had produced the exhibit, which was a copy of the original manual, in response to the Retirees' motion to produce certain job descriptions. When the Retirees attempted to introduce

this exhibit into evidence, the City objected on the grounds that it was not the best evidence and was not properly authenticated. The objections were sustained.

Retirees maintain that documents produced pursuant to TR. 34 should be admissible in the form produced by the opposing party subject, of course, to any substantive objections available. They argue that the City ought not to complain about the form in which it produced the document.

 Where a party in control of an original document produces a copy it would be manifestly unfair to sustain its objection to the admission of the copy on the grounds that it is not the best evidence or properly authenticated. TR. 34(D) provides:

> "When a party or witness in control of a writing or document subject to examination under this rule or Rule 9.2(E) refuses or is unable to produce it, evidence thereof shall be allowed by other parties without compliance with the rule of evidence requiring production of the original document or writing as best evidence."

This rule contemplates that when documents are requested the originals will be produced or else any best evidence objections to the admission of the copy produced are waived. Similarly any objections on the grounds of improper authentication are waived since the production of a document that is not genuine would be contrary to the notions of fair play and substantial justice which the discovery rules are designed to further.

 Therefore the trial court was in error when it excluded Exhibit 4 from evidence at trial. Nevertheless this improper exclusion was harmless error since it was sufficiently covered by other evidence. *Costa et al. v. Costa et al.* (1953), 124 Ind. App. 128, 115 N.E.2d 516. The Retirees had offered the exhibit for the purpose of establishing that there was no such classification as engineer in the Fire Department and that all firefighters were privates except for those promoted to the officer grade. Patricia DeClercq, the Clerk of the Board, testified that all its records were in her custody and under her supervision. Her search of those records revealed that there was nothing in the minutes of the Board's meetings to show that the category of engineer was ever established in the Fire Department. Ernest Rozanski, a former captain in the Fire Department and a 16-year veteran of the force, testified that engineers and privates were basically the same.

No reversible error having been shown, the judgment of the trial court is affirmed.

Affirmed.

GARRARD, P. J., concurs.

STATON, J., dissents with opinion.

STATON, Judge, dissenting.

I dissent. The promotional system adopted by the City of South Bend for its policemen and firemen ultimately works to circumvent our state legislature's scheme for the payment of pension benefits to municipal police and fire retirees. This promotional system serves only to relieve the City from its statutory duty to include longevity pay in its computation of pension benefits. This circumvention of the legislative scheme is established by the evidence; therefore, the trial court's judgment is clearly erroneous.

An understanding of the question erroneously decided by the Majority is facilitated by an examination of the legislatively-established scheme for the computation of pension benefits due police and fire retirees. Pursuant to IC 1971, 19–1–24–3, Ind.Ann. Stat. § 48–6403 (Burns Code Ed.), retired policemen are to receive "fifty per cent [50%] of the salary of a first-grade patrolman." Longevity pay must be included in any computation of the salary upon which the pension is based. *Orban v. Allen* (1968), 143 Ind.App. 513, 241 N.E.2d 378, 380; *Kilfoil v. Johnson* (1963), 135 Ind.App. 14, 191 N.E.2d 321. Furthermore, pensions are to be computed on the basis of the highest paid first-class patrolman's salary. IC 1971, 19–1–24–3(3), *supra; City of Vincennes v. McCarter* (1968), 142 Ind.App. 493, 236 N.E.2d 76, 78; *Kilfoil v. Johnson, supra.* An analogous statutory scheme governs

pension benefits for retired firemen; pursuant to IC 1971, 19–1–37–14, Ind.Ann.Stat. § 48–6528 (Burns Code Ed.), a retired fireman is to receive "a sum equal to fifty per cent [50%] of the monthly wage received by a fully paid first-class fireman . . . ."[1]

Before examining the evidence relating to South Bend's systems for the promotion of its policemen and firemen I note that for our purposes here, the systems used in each department are identical. Nonetheless, in the interest of clarity, I will examine them separately.

## POLICE DEPARTMENT

Prior to 1970, the South Bend Police Department's system of promotion squared neatly with the terminology and design of the legislature's pension scheme. Under the then-existing scheme, the top rank available to non-administrative police personnel was status as "First-Class Patrolman". A first-class patrolman received a base salary which was supplemented with longevity pay figured in yearly increments.

In 1970, however, this system was replaced with the promotion system-at-issue. Under the new system, patrolmen were divided into three ranks: (1) Officers-in-Training; (2) Patrolmen Second Class; and (3) Patrolmen First Class. According to the system, policemen advanced through these three ranks on the basis of longevity; policemen obtained the rank of first-class patrolmen after two years of service. Thereafter they received one longevity pay increase at the beginning of their third year of service. *However, no more longevity pay increases were available to a policeman so long as he retained his rank of first-class patrolman. In other words, a ceiling was placed on the salary any policeman could receive as a first-class patrolman, regardless of the length of his service in that rank.*

Only if a policeman advanced from the rank of "Patrolman First-Class" to that of "Corporal" did his longevity pay resume. The rank designation "Corporal" was created with the inception of the new promotion scheme in 1970.

Two factors determined whether a patrolman first-class was promoted to the rank of corporal: (1) five years of service with the police force, and (2) a recommendation by the Chief of Police that the policeman be promoted from "First-Class Patrolman" to the rank of "Corporal."

The testimony of the various Chiefs of Police who administered the promotion system clearly reveals that with rare exceptions, promotions from "First-Class Patrolman" to "Corporal" were granted as a matter of course to policemen with five years service. The Chiefs' testimony also refutes the Majority's speculation that the reason virtually no policeman was denied the promotion was that the City considered its police force "to be of high caliber." The following is the testimony of the Police Chiefs who made the recommendations for promotions:

"MR. LOREN BUSSET: CHIEF OF POLICE, 1969 to 1971

"Q. Were there officers with more than five years' not promoted to corporal?

"A. Yes.

"Q. Name them.

"A. I could not name them now without referring back.

"Q. Can you estimate the number?

"A. Two or three, I would imagine.

"Q. And what was the reason or reasons that you gave for not recommending these two or three for promotion to corporal?

"A. Minor disciplinary problems. In one instance I recall the officer had gar-

---

1. Under both statutory pension plans, only retirees with more than twenty years active service receive "fifty per cent" of the base figure. Those with less than twenty years active service receive a smaller percentage of the base amount. In any case, however, the basis for the computation remains the same: police pension benefits are determined on the basis of the first-grade patrolman's salary, while fire retirees' benefits are determined on the basis of a "first-class" fireman's salary.

nishees against his wages and things of that nature.

\* \* \* \* \* \*

"MR. ROBERT W. SEALS: CHIEF OF POLICE, 1972 to 1973

"Q. So what kind of conduct or behavior or performance would a patrolman have to be involved with before he would be turned down for the grade of corporal when he became eligible by length of service while you were Chief?

"A. Basically it would be conduct unbecoming an officer.

\* \* \* \* \* \*

"THE WITNESS: Would you restate your question?

"Q. Yes. Would the conduct that would prevent a five-year patrolman from becoming a corporal be the kind of conduct that would evoke disciplinary action?

"A. Yes, sir.

\* \* \* \* \* \*

"MR. ROBERT J. URBAN: CHIEF OF POLICE, 1973 to 1974

"Q. Did you have occasion while you were police chief to not recommend South Bend patrolmen who had been on the force for five years?

"A. Not to my memory at this time.

\* \* \* \* \* \*

"MR. JOHN WALSH: CHIEF OF POLICE, 1974 to 1976

"Q. When Hazinski [an administrative officer] would say somebody had reached five years, you would look over the portfolio of that man and ask others whether this guy should receive the promotion or not?

"A. I would check his personnel file.

"Q. It wasn't automatic but you would look to see if the guy deserved to be appointed to corporal; isn't that correct?

"A. We did, but *it was an automatic promotion.*

\* \* \* \* \* \*

"Q. You had the power to turn down that promotion in rank, did you not?

"A. Yes.

"Q. And while you were the Police Chief, did you ever have occasion not to approve the promotion?

"A. Not to my knowledge, no." (Emphasis supplied.).

As this testimony reveals, the "automatic" nature of the promotion was not, as the Majority has suggested, a reflection of the City's appreciation for the "high caliber" of its police force. Rather, the fact that promotions were rarely denied simply reflects the fact that a promotion was forthcoming to all Patrolmen First-Class who survived five years service and conformed their conduct to department rules and regulations.

The routine dispensation of rank "Corporal" by the South Bend Police Department is further exemplified in the testimony of Mr. Richard P. Hazinski,[2] a Sergeant and former Divisional Chief of the Department's Services Division:

"Q. Have you ever been a corporal?

"A. Yes, I have.

"Q. When were you a corporal?

"A. I can't remember right off when the new rank structure came about. I think in 1970 when anybody that had five years or over was automatically appointed as a corporal."

The record reflects that on January 1, 1970, the date that the new promotion system went into effect sixty Patrolmen—among them Richard Hazinski—were *en masse* promoted to the rank of "Corporal" by a single written order.[3]

This evidence points unerringly to the conclusion that promotions were for all practical purposes a matter of course. Oth-

---

2. We note that it was established in the trial court that Judge Hosinski and Witness Hazinski are in no way related.

3. The order was made upon Chief of Police Loren Busset's recommendation to the Board of Public Works and Safety. Plaintiff's Exhibit 32, Transcript p. 703(A).

er evidence reveals another tell-tale aspect of the promotion system: *the duties of a "Corporal" were no different than those of a "Patrolman First-Class."* [4] Former Chiefs of Police Loren Busset, Robert Urban, and John Walsh all testified that Corporals and Patrolmen First-Class had identical duties:

BUSSETT:

"Q. Were the duties any different in corporals and patrolmen while you were chief?

"A. No, sir.

\* \* \* \* \* \*

URBAN:

"Q. The corporals in the South Bend Police Department, did they have a different uniform than a patrolman?

"A. No, sir.

"Q. Did they wear stripes?

"A. No, sir. The only distinction was, at the time of the era I was Chief, was the badge designated corporal on the individual badges.

WALSH:

"Q. Was it different while you were chief between the pay of a corporal and the pay of—what was the grade below?

"A. Patrolman first-class.

"Q. What was the difference in pay?

"A. I don't have that information at this time.

"Q. Was there any difference besides that between a corporal and patrolman first-class?

"A. Just pay.

"Q. Nothing about duty assignment?

MR. MCLAUGHLIN: I am going to object to it, Judge.

"Q. Was there anything that was any different between a corporal and a patrolman while you were chief?

"A. No."

As this testimony reveals, only dissimilar badges and different salaries distinguished a "Corporal" from a "Patrolman First-Class."

With all due respect for our law enforcement agencies, the badges—for our purposes here—are of no consequence. The amount of salary received by each rank, however, is significant. As heretofore discussed, the pension benefits received by a municipal police retiree are calculated on the basis of the salary received by a Patrolman First-Class in the particular municipality. IC 1971, 19–1–24–3, *supra*. In addition, longevity pay must be included in the computation of pension benefits. *Orban v. Allen* (1968), 143 Ind.App. 513, 241 N.E.2d 378, 380; *Kilfoil v. Johnson* (1963), 135 Ind. App. 14, 191 N.E.2d 321.

With these requirements in mind, it is enlighting to examine the South Bend Police Department's salary schedule for the year 1975. The pertinent portions read:

| "Service Years | Officer In Train. | Patrolman | Patrolman First Class | Corporal |
|---|---|---|---|---|
| 0–1 | $8,520 | | | $9,000 |
| 1–2 | | $9,000 | | 9,240 |
| 2–3 | | | $9,480 | 9,480 |
| 3–4 | | | 9,720 | 9,720 |
| 4–5 | | | | 9,960 |
| 5–6 | | | | 10,200 |
| 6–7 | | | | 10,440 |
| 7–8 | | | | 10,680 |
| 8–9 | | | | 10,920 |
| 9–10 | | | | 11,160 |
| 10–11 | | | | 11,400 |
| 11–above | | | | 11,640" |

To state the obvious, the maximum salary which a Patrolman First-Class could receive in 1975 was $9,720. Pursuant to IC 1971, 19–1–24–3, *supra*, pension benefits received by the retirees who initiated this action were calculated with reference to the figure $9,720.

---

4. I am fully cognizant of testimony that indicates that if three Patrolmen and one Corporal were on the scene of an accident, the Corporal would be in charge. In any such situation, the senior policeman in rank or tenure is in charge, according to Department regulations. Thus, the rule was not peculiar to Corporals; if a Sergeant arrived on the scene, he would take command. Furthermore, due to the automatic nature of promotion to Corporal for Patrolmen with five years experience, the Corporal would be in charge on the basis of tenure—regardless of rank. In other words, at this level of the department hierarchy, rank and tenure were one and the same.

As is readily apparent, *longevity pay was not available* to a Patrolman First-Class beyond the one incremental advance ($240) afforded him at the conclusion of his third year of service. Only when a Patrolman was promoted to the rank of Corporal was his longevity pay resumed.

Since pension benefits are calculated on the basis of the salary received by a Patrolman First-Class, longevity pay was not—as required by the laws of this state—included in the computation of the pension benefits received by South Bend police retirees. Longevity pay (yearly increments of $240) was contained only in the salary for a Corporal. In tangible terms, the upshot of the South Bend promotion system and salary schedule was this: The retirees' pensions were erroneously computed on the basis of the figure $9,720 rather than $11,640, the ultimate amount a Corporal could receive after eleven years of service in the Department. (See above salary schedule). For a retiree with twenty (20) years of service, the consequence of this erroneously-based computation would be an annual deprivation of $960.00. IC 1971, 19–1–24–3(3), *supra*.[5]

This impact was the only significant result of the City's adoption of its new promotion system and concomitant salary schedule. The promotion from Patrolman First-Class to Corporal was for all practical purposes automatic; it was bestowed upon the basis of five years longevity in the Police Department. The duties of a promoted policeman remained unchanged. The City's adoption of its new promotion system merely worked a *de facto* circumvention of the municipal police pension plan enacted by our state legislature. The evidence points unerringly to that conclusion; the Majority errs when it holds otherwise.

Finally, I take issue with the Majority's statement that the retirees' only recourse to remedy the deprivation of pension benefits is with the legislature. I suggest that the

legislature never contemplated that its pension plan would be circumvented by appellations without substance. After all, to borrow a phrase from James Thurber, the South Bend Police Department's "Corporal" is a "mythical beast"[6]; he is simply a Patrolman First-Class with five years experience. To remedy the *de facto* circumvention which the title "Corporal" works on the legislature's pension plan, I would hold that for purposes of calculating South Bend police retirees' pension benefits, the phrase "first-grade patrolman" contained in IC 1971, 19–1–24–3, *supra*, means "Corporal." This approach is consistent with the well-settled rule that the police pension statutes are to be liberally construed in favor of those who receive the pension benefits. *Schock v. Chappell* (1952), 231 Ind. 480, 109 N.E.2d 423. This approach is imperative to bring the South Bend promotion scheme within the spirit, objective, and meaning of IC 1971, 19–1–24–3, *supra*; the spirit rather than the letter of the statute should prevail. *Economy Oil Corp. v. Indiana Dept. of State Revenue* (1975), 162 Ind.App. 658, 321 N.E.2d 215, 218; *Town of Kewanna Water Wks. v. Indiana Emp. Sec. Div.* (1961), 131 Ind.App. 400, 171 N.E.2d 262, 264. *See also, City of Gary v. Baker* (1974), 166 Ind.App. 26, 333 N.E.2d 808, 810.

## FIRE DEPARTMENT

For purposes of brevity, I forego a lengthy and detailed examination of the nuances of the South Bend Fire Department's promotion scheme. For our purposes here, it is in all respects identical to the police promotion scheme heretofore discussed. The circumvention worked by the fire promotion system on the legislature's pension plan is established *without contradiction* by the evidence.

Like the Police Department, a new promotion system was adopted for the Fire Department effective January 1, 1970. With the effective date of the new promo-

---

**5.** For those retirees with twenty years of active service, the statute provides that the pension be calculated on the basis of "fifty per cent" of the Patrolman First-Class' salary.

**6.** James Thurber, "The Unicorn in the Garden", from *Fables of Our Time* (2nd Ed. 1940).

tion, a new rank was created in the department. The designation for the new rank was "Engineer." Firefighters advanced through the following rank categories under the new system: (1) Fireman-in-Training; (2) Fireman; (3) Fireman First-Class; and (4) Engineer.

Also effective January 1, 1970, 127 Firemen were promoted *en masse* in a single written order to the rank of "Engineer." This mass promotion reflects the fact that once any Fireman First-Class had served five years he was—under the new system—automatically promoted to the rank of "Engineer." Former Chief of the Fire Department Joseph Zurat (1968–1971) and Jack Bland (1973–1976) both testified that the promotions were automatic upon a fireman's attainment of five years longevity. *In fact, there is no evidence that any fireman was ever denied the promotion to "Engineer."*

Both Former Chiefs of the Fire Department also testified that there was no difference in the duties of a "Fireman First-Class" and those of an "Engineer." In other words, an "Engineer" was nothing but a "Fireman First-Class" with five years experience.

The only difference between the two ranks was the amount of salary firefighters in each category received. According to the Fire Department's 1975 pay schedule, a "Fireman First-Class" received an annual wage of $9,480. The highest salary an Engineer could receive under that pay schedule was $10,733. Inasmuch as the ranks performed the same duties, the pay difference can only be said to reflect longer tenure of those firemen ranked as "Engineers." It was, after all, longevity which earned them their ranking.

Municipal fire retirees' pension benefits are computed on the basis of the salary received by a "first-class fireman." IC 1971, 19–1–37–14, *supra*. It is readily apparent that the only consequence of the South Bend Fire Department's promotion scheme and concomitant salary schedule was that its retirees were deprived of the benefits the legislature intended for them.

The Majority clearly errs when it holds otherwise. For the reasons previously discussed, I would hold that the legislative phrase "first-class fireman"—for purposes of computing South Bend fire retirees' pension benefits—should be interpreted to mean "Engineer."

## SUMMARY

Between 1970 and 1975, roughly two hundred firemen and policemen were eligible for promotion to the newly created ranks of "Corporal" and "Engineer." Of these eligible municipal servants, only four or five were denied a promotion; those denials, which all occurred in the Police Department, were all motivated by the fact that the subject officers had violated Department rules and regulations. In both departments, the promoted officers and firefighters continue to discharge the same duties which were charged to them under their previous rank. It can only be said that the new ranks of "Corporal" and "Engineer" were a matter of form and not substance; the Majority errs when it concludes otherwise.

The legislature intended the South Bend police and fire retirees to pension benefits determined on the basis of longevity. The titles "Corporal" and "Engineer" served only to circumvent the legislature's intent. The Majority has erred in refusing to enforce the spirit and objectives of the pension statutes; its opinion elevates form over substance through its adherence to the letter of the pension statutes.

I dissent.